J. BURNSIDE & CO. *v.* McKINLEY & MOORE.—McELROY & BRADFORD, Garnishees.—DAVID TAYLOR & CO., Intervenors.

The garnishees received a lot of cotton from the defendants, with instructions to sell as soon as practicable or advisable, and to pay over the proceeds to the intervenors. The garnishees communicated at once with the intervenors, and submitted themselves to their arbitrament of the propriety of an immediate sale, tendering their advice to hold on for a rising market.

The intervenors accepted this advice, and directed the garnishees to delay sales. *Held:* That the *stipulation pour autrut* contained in the letter of instructions to the garnishees, having been accepted by the party for whose benefit it was made, could no longer be revoked by the shipper of the cotton.

The intervenors acquired a vested interest in the cotton, which entitled them to a preference over an attaching creditor.

APPEAL from the Sixth District Court of New Orleans, *Cotton,* J. *Elmore & King,* for plaintiffs and appellants. *Clarke & Bayne,* for intervenors.

The court having rendered a decree in favor of the plaintiffs and appellants, *Clarke & Bayne* applied for a re-hearing:

There is no question of more general interest to a commercial community than that passed upon in this case. None that has been more frequently before the courts—none better settled by precedent—than the doctrine which is understood to be admitted here, that "where the owner of property has lost his control over it, and cannot change its destination, his creditors cannot attach." If this doctrine is to be varied by circumstances—after being so often and so uniformly announced from the bench—public policy requires that the grounds of this variation should be clearly and definitely understood.

The case is stated by the court as follows: "The plaintiffs, being creditors of *McKinley & Moore,* who are absent defendants, levied an attachment upon the twenty-one bales of cotton in the hands of *McElroy & Bradford.* Accompanying the shipment from the defendant to *McElroy & Bradford* was the following letter of instructions:

"'SHREVEPORT, LA., March 29th, 1856.

"'*Messrs. McElroy & Bradford:*

"'I send you some cotton, which I hope you will receive in due time, and I wish you to sell as soon as you can, or as the times justify, and when sold please pay the proceeds to *David Taylor & Co.* I will forward some more as soon as I get it to the river. Please let me hear from you as soon as you sell.'

"This letter was shown, before the attachment, to *David Taylor & Co.,* who have intervened in this suit, and have claimed the proceeds of this shipment, as applicable to a debt due to them from the defendants. At the date of the service of the attachment, the cotton had been sold, but had not been weighed or delivered."

64

Burnside
v.
McKinley.

It appears by the answers of the garnishees and the testimony of their clerk that the cotton was received, with the above letter of instruction, and soon after its receipt, *David Taylor & Co.* were informed that the cotton had been received *for them,* and that they (the garnishees) would hold it for them, and pay them over the proceeds. They stated to *Taylor & Co.* that they were not selling any cotton at that time; that they would hold these twenty-one bales for them (*Taylor & Co.*) if they were willing. *Taylor & Co.* accepted the shipment made to them, and consented that the garnishees might hold for them till they made sale. They had made sale, and received eight hundred dollars from the purchasers on the day of sale, but had not weighed the cotton. These are the facts of the case.

The court say: "The possession of the agents was, so far only as legal consequences flowed therefrom, that of the principal, and in his hands it would have been liable to attachment." What legal consequences did flow from the possession of the agent under the instructions above given? The first consequence was that *McElroy & Bradford* could not divert it from the purpose for which it had been sent—could not divert it from *David Taylor & Co.* This the court admit in commenting on the case of *Palmer & Co.* v. *Hornor,* 10 An. The next consequence is, that *McElroy & Bradford* stand charged as holders of this cotton for *David Taylor & Co.* the moment after they have communicated to them the receipt of the cotton for them. They attorned to them, and recognized them as entitled to the cotton or its proceeds. Such obligations arose between them and *David Taylor & Co.* as prevented *McKinley & Moore* from changing the destination of the cotton. *Cutter* v. *Baker,* 2 An. 572. In the case of *Gray* v. *Trafton,* 12 M. R. 702, an order had been given upon attorneys to pay to ———, *when collected,* and the court say: "In the present case the evidence fully establishes the fact that *Trafton's* attorneys agreed to pay the claimants the amount by him ordered, when the money should be collected, which did not take place until long after the date and acceptance of his order. The attorneys were, therefore, debtors only conditionally, viz: in the event of recovering the money of their client. The latter was free to direct its appropriation in anticipation of collection, and the persons to whom payment was ordered, after acceptance by his agents, held a vested right in the debt, subject, however, to the condition of said acceptance. From that period *Trafton's* attorneys, thus charged with the collection, may be considered as trustees for the claimants, who had a vested interest, and consequently the funds thus transferred were not subject to the plaintiff's attachment." *Gray* v. *Trafton et als.,* 12 M. R. 703.

In the case of *Armor* v. *Cockburn et als.,* 4 N. S. 668, "the defendant, it appears, was indebted to both plaintiff and intervenor; he shipped twenty-five bales of cotton in Alabama, and delivered it to one *Mason,* with directions to sell the same on his arrival in New Orleans, and pay the proceeds to *Banks, Miller & Kincaid,* the intervening creditors, to extinguish, as far as they would go, a debt he owed them. The cotton, on its arrival, was placed in the hands of the intervenors, as agents for the said *Mason.* Before the service of the attachment, he informed them that he had received the cotton from *Cockburn,* on the conditions already expressed, and that, in conformity with these instructions, he would pay over the proceeds to them, to which they assented. *The cotton was not sold until after the attachment was levied.* We think that, after the promise made to the intervenors, and accepted by them, the cotton could not be attached. We cannot distinguish the case from *Gray* v. *Trafton,* and we have never had occasion to doubt the soundness of the principle on which that case was decided. The true test in such case is this: that where the owner of the property has lost all power over it, and cannot change its destination, the creditors cannot attach; the converse of the rule being that whenever the proprietor can sell and deliver the creditor may seize. In this case that power was gone. After the person in whose hands the cotton was placed promised to pay the intervening creditors, he became personally responsible to them, and the owner could not, by a change of determination, have compelled him to pay the money to any other person. The agreement constituted what is called a *stipulation pour autrui,* and once accepted by those for whose benefit it was made, it could not be revoked." C. C. 1896; 5 La. 316. Now this case is precisely on all fours with the case before the court, except ours is a stronger case in this, that the cotton had been sold by the garnishees, and eight hundred dollars of the proceeds had been realized by them.

In that case, as in ours, the shipment was made to pay a preëxisting debt due to the intervenors. No advance was asked or obtained by the agents, nor was any new credit given upon the faith of the promised appropriation of the proceeds. The shippers announced to their consignee, that the cotton was sent to him, and he was to pay the intervenors out of the proceeds. The cotton was attached *before it was sold*, and yet the court, treating the cotton as identical with its proceeds, gave it to the intervenors. In no case in the books is any distinction drawn between the Article itself and its proceeds, or that into which it is converted in the usual course of business ; and we do not understand the court to decide this case upon such a narrow point as this.

In the case of the *Bank of St. Mary* v. *Morton*, 12 Rob. 411, *Morton* shipped 163 bales of cotton to *Franklin & Henderson*, and gave an order for the avails of shipment. This order was communicated to *Franklin & Henderson* before sale and before attachment. The court, putting out of view all other questions, say : "It seems to us that, it suffices that said proceeds were regularly transferred to the intervenor for a valuable consideration, before the date of the attachment, to give the latter the right of recovering them as against an attaching creditor, provided it is shown, that due notice of the transfer was given to the debtor of the proceeds, previous to the levying of the attachment. The doctrine, so often recognized by this court—that where the owner has lost control over his property, creditors cannot attach—is applicable to the rights of the parties in this cause." In all the cases decided, the court intimates, that whenever the agent of the shipper has communicated to third persons notice of shipment for advantage of said third persons, from that moment the shipper loses control and has no attachable interest in the shipment. In the case of *Goodhue* v. *McCarty*, where the decision is adverse to the intervenors, it is put distinctly upon the ground "that nothing had occurred which created, on the part of *Hewitt, Heran & Co.*, consignees, an obligation to hold the property for the benefit of intervenors." In the case of *Piner* v. *Williams*, the real question argued in the court below was, whether or not the intervenors were entitled to the proceeds of the cotton, although they had no notice of shipment to pay them, and the case of *Bonaffe* v. *Lane*, 5 An. 225, was cited in support of this doctrine. The Judge of the court below put his decision distinctly upon the ground, "that the attachment was levied before any correspondence was had with the intervenors, or any act was done by them, based upon the supposed assignment."

In the court above, the Judges intimate, that *Yeatman & Co.*, the garnishees, by receiving the cotton under instructions to pay proceeds to intervenors, accepted a trust in favor of said intervenors, even without notice to said intervenors, from which they could not be relieved by paying the money over to the original shipper ; but, the court say further, that they are relieved from the necessity of deciding this question by proof of the acceptance by intervenors, of shipment made for their advantage. After such an acceptance, there was no doubt of the right of intervenor in preference to an attaching creditor. And in the case of *Oliver* v. *Lake*, 3 An. 78, which was argued most elaborately, it will be seen, that the sole object in seeking to make the contract subject to the law of Mississippi is, to relieve the intervenors from the necessity of proving that they had notice of the shipment made for their advantage—to relieve them from showing that they had accepted it.

It will be seen, by examining the argument of the distinguished counsel engaged in that case, (one of them, *Judge Bullard*, formerly occupying a seat where your honors now sit,) it was conceded, that if the intervenor had notice of the shipment for his advantage, and had accepted it, the property was not attachable as the property of the shipper ; and we understand that to be the doctrine of this case.

The cotton might be at the risk of the shipper, and yet his ownership be so far diverted as to place it beyond the reach of attachment by his creditors. The case of *Urie* v. *Stevens*, 2 Rob. 253, is put upon the grounds that the consignees, agents of shipper, had, with his consent, agreed to pay out balance proceeds cotton to *Turner & Woodruff*; that the owner had lost his control, and, therefore, it could not be attached by his creditors.

The case of *Cutters* v. *Baker*, 2 An. 573, does not seem to be put upon any contract made at the time of the shipment, but upon the agreement made at New Orleans, by consignees, to hand over proceeds to the intervenor; and is stated by the court as follows : "We consider the rights of the bill-holders as

BURNSIDE
*v.*
McKINLEY.

superior to those of this attaching creditor. The agreement made between the bill-holders and *F. J. & Co.* in conformity to ·*Baker's* letter of advice, anterior to the attachment, placed that *merchandize and its proceeds* beyond the control of *Baker.*" And as a natural sequence·beyond the attachment of his creditors. The cases of *Armor* v. *Cockburn*, 4 N. S., 667, and other cases are here cited.

No advance was necessary by *Taylor*, as a special consideration. A consideration is anything that induces one to act or not to act. The agreement of *McElroy & Bradford* to pay proceeds to them, may have induced them not to seize the cotton, not to seek other modes for collection of their debt. Such is a valid consideration. *Mouton, Governor*, v. *Halsted*, 1 An. 192.

No special advance seems to have been made or required, in the other cases heretofore cited, to bring them within the rule.

We have endeavored to show that there is but one rule by which to solve all questions like this, now before the court. That the creditors of a shipper of property can have no more rights upon it, in the hands of consignees, than he has. That this case cannot be distinguished from the cases of *Gray* v. *Trufton*, 12 Martin's Reports, 702; *Armor* v. *Cockburn*, 4 N. S. 667; *Oliver* v. *Lake*, 3 An. 78; *Piner* v. *Williams*, 10 An. 278; and others. That, in those cases, the shipment was to pay a preëxisting debt, without any special advance made on the shipment. That the position of the consignee is not identical with that of the shipper, because the acceptance of a shipment under instructions, to appropriate the proceeds in a particular manner, creates an obligation on his part thus to appropriate them. That, when he communicates this to the third person, for whose benefit the shipment is made, the instructions cannot be revoked by the shipper, and such third person would have a right to sue consignees for the proceeds. C. C. 1896; C. P. 35; 11 An. 333; *Pemberton* v. *Zacharie*, 5 La. 316; numerous cases cited, Hennen's Digest, p. 1086.

It was a *stipulation pour autrui*, which the shipper. was authorized to make, and which the parties receiving it bound themselves to comply with; they could not divert to their own use, as decided in case of *Palmer* v. *Horner*, and suggested in case of *Piner* v. *Williams*. *McKinley & Moore* could not, by a change of mind, recall the cotton, and give it any other destination. They could not relieve *McElroy & Bradford* from the obligation created by their promise to pay to *David Taylor & Co.;* and in this ·respect, the position of *McElroy & Bradford* is far different from that of *McKinley & Moore*—the possession of *McElroy & Bradford* is not the possession of *McKinley & Moore*—they have become agents for *David Taylor & Co.*, for whose account, and advantage the cotton was shipped to them. If *McElroy & Bradford* had wasted the cotton, or, by negligence, had lost it, *David Taylor & Co.* could, under the cases cited, have sued them for its value.

If *McKinley & Moore* were in New Orleans, in possession of the cotton it might be physically possible for them to divert the proceeds from *Taylor & Co.*, though they could not do it in good faith; but *McElroy & Bradford* could not do so under new instructions from *McKinley & Moore*. They may be so far the agents of *McKinley & Moore* as to place the cotton at their risk (as in the case of *Oliver* v. *Lake*,) and yet under such obligations to *David Taylor & Co.* as to compel a delivery of proceeds to them.

*McKinley & Moore* may have such a qualified ownership as to put the cotton at their risk, make its loss before delivery their loss, and yet have so far lost control and dominion over it as to put it beyond the reach of their creditors. In the case of *Oliver* v. *Lake*, Chief Justice Slidel thus enunciates this doctrine : " In this connection it is proper to notice the argument of the plaintiff's counsel with regard to the ownership of this property, as tested by the maxim *res perit domino.* It is very true that, if the cotton had been lost on its voyage to New Orleans, or been destroyed by fire here, or if *Martin Pleasants & Co.*, after selling it, and receiving the proceeds, had failed, the loss would have fallen on *W. A. Lake*, the shipper. But there is no inconsistency in the concurrent existence of a qualified ownership in one party and a control and dominion over it for certain purposes in another party. Thus, when property is given in pledge, the pledgor parts with the possession and control of the thing pledged ; but, if it perishes without the fault of the pledgee, the loss is the pledgor's ; and the debt remains unsatisfied. The payee of a bill of exchange has an order upon the funds in the hands of the acceptor ; but, if the acceptor fails, the drawer, if there has been due diligence on the part of the holder,

bears the loss; so a consignee, who has made advances, is deemed a qualified owner of the property consigned; but there is also a qualified ownership in the consignor, and its destruction is his loss."

*McElroy & Bradford* had sold the cotton, and on the day of sale, received eight hundred dollars. Were not *David Taylor & Co.* entitled to those eight hundred dollars, proceeds of the cotton, the moment they came into the hands of *McElroy & Bradford?* But we have shown, that in all the cases the merchandize and property shipped are treated as convertible terms for proceeds. As in case of *Gray* v. *Trafton*, the order is for money when collected: and in case of *Armor* v. *Cockburn*, the instructions are to pay the balance of proceeds of cotton, and the attachment was before sale.

After examining all the cases with great care, and the books are full of them, and turning them in every possible phase, we find that each one inculcates the doctrine in broad and general terms—that, " where the owner has lost his control over it, and cannot change its destination, his creditors cannot attach." A doctrine thus hallowed by precedent—universally understood and acquiesced in by the bar and the community at large should not be varied for any slight cause.

*Elmore & King* replied:

We have attentively read the argument in behalf of the intervenors for a rehearing, and consider that its whole force depends upon a very ingenious statement of the case, not at all warranted by the evidence. That statement is as follows:

" It appears, by the answers of the garnishees and the testimony of their clerk, that the cotton was received, with the above letter of instructions; that soon after its receipt *Taylor & Co.* were informed that the cotton had been received *for them*, and that they, the garnishees, would hold it for them and pay over the proceeds. They stated to *Taylor & Co.* that they were not selling any cotton at the time; that they would hold these twenty-one bales for them (*Taylor & Co.*) if they were willing.

*Taylor & Co.* accepted the shipment made for them, and consented that the garnishees might hold for them till they made the sale."

This is not the case before the court as shown by the evidence.

The answers to the interrogatories were made by *Mr. McElroy*. In his testimony in the case, he shows that he had no personal knowledge whatever of the affair. That all that had passed between his firm and the house of *Taylor & Co.* had been through *Mr. Gribble.*

All that was said about "accepting the letter, or the cotton, or the proceeds, came from *Mr. McElroy*; who says himself he had no interview with *Taylor & Co.* about the cotton.

To get at the facts, then, we must, of course, refer to the testimony of *Mr. Gribble.*

He tells us exactly what passed between him and the house of *Taylor & Co.* and winds up with the emphatic declaration, that " this is exactly what passed and *nothing more.*" In his testimony there are no such expressions as " *Taylor & Co.* accepted the shipment made for them, and consented that the garnishees might hold for them till they made sale."

He did not inform *Taylor & Co.* " that the cotton had been received for them, and that the garnishees would hold it *for them*." He simply, as he states, "showed them the letter of instructions, and said *McElroy & Bradford* could sell the cotton immediately, but were then holding the cotton for an advance in the market, and should hold theirs also; and *Taylor & Co.* gave their assent to this." This was what passed, " *and nothing more.*"

We here again insert the letter of instructions:

SHREVEPORT, La., March 29th, 1856.

*Messrs. Elroy & Bradford*:

Gentlemen,—I send you some cotton, which I hope you will receive in due time, and *I wish* you to sell as soon as you can, or, as the times may justify; and when sold, please pay the proceeds to *David Taylor & Co.* I will forward some more as soon as I get it to the river. Please *let me hear* from you as soon as you sell.

Yours, very respectfully,<br>[Signed]     J. N. McKINLEY

This letter, with *Mr. Gribble's* testimony, and the admitted fact that the cotton was not weighed or delivered at the date of the attachment, constitute the material facts of the case.

This letter was showed to the intervenors, and they were thus apprised of the nature of the agency of *McElroy & Bradford*, and the extent of their powers. This letter was their power of attorney. The defendants were bound by their acts, just so far as this letter authorized, and no further; and the intervenors are, in law, presumed to have known this.

The letter, on its face, is a mere private letter, which could not be communicated without a violation of the faith of a private correspondence. This the intervenors knew. It was not intended, either from its language or by any fair implication, to put the cotton out of the control of *McKinley & Moore*—this the intervenors knew. Any attempt of *McElroy & Bradford* to take this cotton out of the control of *McKinley & Moore*, and put it under the control of *Taylor & Co.*, was unauthorized by the letter, and not binding on *McKinley & Moore*. All this the intervenors knew or ought to have known.

If *McElroy & Bradford* misunderstood the letter, and misconceived their powers, *Taylor & Co.* acquired no advantage from the mistake, because they were cognizant of the mandate and the power conferred.

Suppose *McKinley & Moore* had been in the city, and had informed *Taylor & Co.* that as soon as they sold the cotton and realized the proceeds, they would pay them? Would this have placed the cotton out of their control? Such language is common with planters to their creditors.

This is in effect precisely what they did through their agents *McElroy & Bradford*. Is it possible that the same expressions, through an agent not authorized to make the communication, should have greater effect than when made by the principal in person? Suppose *McKinley & Moore* had casually remarked, in the presence of *McElroy & Bradford*, that when the proceeds of their cotton were realized, they intended to pay *Taylor & Co.*; and *McElroy & Bradford* had repeated this casual conversation to *Taylor & Co.*, would this have taken the cotton out of the control of *McKinley & Moore?* This is the substance of what occurred, so far as the legal rights of the parties are concerned.

The counsel for the intervenors have argued this case as though the court had decided that the plaintiffs could attach even when the defendant had lost the control of the property. The court made no such decision. What the court decided was, that under the facts of this case, the defendants had not so lost the control of the cotton as to exempt it from attachment.

There was nothing in the letter to *McElroy & Bradford* which could have prevented *McKinley & Moore* from coming to New Orleans, and taking the cotton out of the hands of *McElroy & Bradford*, and selling it themselves.

If *McElroy & Bradford* had violated their instructions with a third person not acquainted with the nature of those instructions, *McKinley & Moore* might, to some extent, have been bound. But *Taylor & Co.* knew the instructions, and are presumed, in law, to have known that *McElroy & Bradford* had no power to give them the control of cotton or any right whatever in the cotton. They cannot, therefore, justify their claim by the acts of agents which they knew were unauthorized. If *McElroy & Bradford* came under any obligations to *Taylor & Co.*, not authorized by the letter of instructions, it was their own affair, and could not affect the right of control in *McKinley & Moore*.

The counsel for the intervenors say: "The possession of *McElroy & Bradford* is not the possession of *McKinley & Moore*. They have become agents for *D. Taylor & Co.*, for whose advantage and account the cotton was shipped to them." This position assumes the whole question at issue. We deny every syllable of it. *McKinley & Moore* shipped the cotton to *McElroy & Bradford*, as their agents. They never authorized them to change the control of the cotton or the possession, to *Taylor & Co.* Receiving the cotton as the agents of *McKinley & Moore*, *McElroy & Bradford* could not, by their own act, change the nature of the possession held by them, or hold it as the agents of *Taylor & Co.*

"A party cannot change, by his own act, the nature and origin of his possession." C. C. 3480; *Hood* v. *Ligrist*, 12 R. R. 210; *Phelps* v. *Hughes*, 1 A. R. 320.

They received the cotton as the agents of *McKinley & Moore*; and as such, they held it at the date of the attachment. The letter of instructions did not

authorize them to hold the cotton as the agents of *Taylor & Co. ;* and this fact the latter knew, because the letter was shown to them.

The counsel for the intervenors have assimilated this case to that where the shipper has given an order to some third person, on the agent for the property or proceeds in his hands.

The order, in such cases, is a declaration on the part of the shipper that he desires some third person to have the control. Its acceptance is an acknowledgment on the part of the agent, that he will in future hold the property for such third person, and thereby becoming the agent of such third person. The cases cited by intervenors' counsel apply only to such causes.

*Gray* v. *Trafton*, 7 M. R. 702, is precisely such a case; also, *Cutters* v. *Baker*, 2 A. R. 572; *Bank of St. Mary's* v. *Morton*, 12 R. R. 411.

It is submitted that the distinction is so broad between such cases and the one before the court, as to render comment unnecessary.

Another class of cases cited by intervenors' counsel, is where the property had actually been transferred, so that the legal title was in the intervenor. Such as—

*Williams* v. *Piner*, 10 A. R. 277. The bill of lading showed the legal title was in *Grant & Barton*, the intervenors. The cotton was shipped on "*their account.*" *Bank of Port Gibson* v. *Burke*, 4 R. R. 440; Abbot on Shipping, old paging note, p. 334 and 335; *Oliver* v. *Lake*, 3 A. R. 78, is a case of the same character.

In *Armor* v. *Cockburn*, 4 N. S. 668, the facts of the case and the reasoning of the court are stated so carelessly and obscurely, that it is only by an attentive perusal that the report can be understood.

The defendant, residing in Alabama, being indebted to *Banks, Miller & Kincaid*, shipped 25 bales cotton, delivered to one *Mason*, with instructions to sell the same, and pay to *B., M. & K. Mason*, on arriving at New Orleans, delivered the cotton itself to *Banks, Miller & Kincaid*, telling the purpose for which it was sent and the conditions under which he had received it.

While the cotton was thus in their own hands, placed there to pay their debt, another creditor of the defendant had it attached.

The court decided that the cotton could not, under the circumstances, be taken out of the hands of *Banks, Miller & Kincaid*.

This is a widely different case from the one before the court. Neither law nor equity would take cotton thus situated out of the hands of one creditor to pay another.

None of the cases relied on by intervenors' counsel are applicable to the case; while the principles stated in the case of *Goodhue* v. *McClarty*, 3 A. R. 56, cover every ground we have taken.

The counsel for the intervenors say that the promise of *McElroy & Bradford*, to pay the proceeds to the intervenors, may have prevented their attaching.

*Mr. Gribble's* testimony shows that no such promise was made; but even had it been, it was unauthorized by *McKinley & Moore*, and did not at all prevent *Taylor & Co.* from attaching. A creditor may even attach property of the debtor in his own hands. *Taylor & Co.* may have supposed that, under the circumstances, it would not be necessary to attach; if so, it was their own mistake, and could not be the foundation of any legal right to the cotton.

Neither could the mistakes of *McElroy & Bradford*, as to their power under the letter of instructions, benefit *Taylor & Co.*, for they were cognizant of the letter and extent of power conferred by it.

With regard to the $800 advanced to *McElroy & Bradford* on the purchase of the cotton, neither the defendants nor *Taylor & Co.* were entitled to that until the sale was perfected by delivery. Until that event, the money belonged to the purchaser, and if anything had prevented the delivery of the cotton, he was entitled to a return of the money.

This was the state of things produced by the attachment in this case. Suppose the Sheriff had taken possession of the cotton, would *Taylor & Co.* have been entitled to these $800? or would the purchaser, who had been disappointed in the delivery? We think, most unquestionably, the money would have to be returned to the purchaser. The same legal consequences flow from the garnishment.

The cotton being liable on the attachment, the whole of the proceeds in the hands of the garnishees must be liable.

BURNSIDE
*v.*
McKINLEY.

Besides, the letter of instructions did not authorize *McElroy & Bradford* to raise money on the cotton, by way of advance or in any other mode, for the benefit of *Taylor & Co.* It only authorized them to pay over the proceeds after the cotton was sold. There could be no proceeds until the cotton was weighed and delivered. The condition precedent, on which the rights of *Taylor & Co.* depended, had not happened at the date of the attachment. That condition could not happen subsequently, so as to change the rights of parties which had become irrevocably fixed by the attachment.

On the re-hearing, the opinion of the court was delivered by

BUCHANAN, J. The garnishees, *McElroy & Bradford*, received on consignment, between the 2d and 12th April, 1856, twenty-one bales of cotton belonging to defendants, accompanied by the following letter of instructions:

"*Messrs. McElroy & Bradford:*

"I send you some cotton, which I hope you will receive in due time, and I wish you to sell as soon as you can, or as the times justify, and when sold please pay the proceeds to *David Taylor & Co.* I will forward some more as soon as I get it to the river. Please let me hear from you as soon as you sell.

"Yours, very respectfully,
"J. N. McKINLEY."

The garnishees immediately notified *David Taylor & Co.* that the cotton was on hand as .shipped by *McKinley* for their benefit, and exhibited to them *McKinley's* letter of instructions, and told them that as soon as the cotton was sold, the proceeds of the same would be paid to them. The garnishees also offered at the same time to *Taylor & Co.* to sell the cotton immediately, if required, but advised them to hold on for an advance in price, to which *Taylor & Co.* assented. Several weeks after this conversation the garnishees made sale of the cotton, but before they had weighed and delivered it, garnishment process, at the instance of plaintiffs, was served upon them herein, on the 1st May, 1856. *David Taylor & Co.* intervene in this suit, prove that they are creditors of defendants, by account, to an amount exceeding the value of the cotton, and claim its proceeds by preference over the attaching creditor.

The facts of this case are very similar to those of *Armor* v. *Cockburn*, 5 N. S. 668. The garnishees, as we have seen, received the cotton from the defendants, who were its owners, with instructions to sell as soon as practicable or advisable, and to pay over the proceeds to the intervenors. Those instructions left a discretion as to time of sale of the cotton, but the destination of the proceeds was peremptory. The garnishees communicated at once with the intervenors, and submitted themselves to their arbitrament of the propriety of an immediate sale, tendering merely their advice to hold on for a rising market. The intervenors accepted this advice, and directed the garnishees to delay sales. The *stipulation pour autrui* contained in the letter of instruction of defendants to the garnishees having been thus accepted by the party for whose benefit the stipulation was made, could no longer be revoked by the shipper of the cotton. C. C. 1884. The shipper had lost the control of it, and could no longer give it another destination.

From the moment of the acceptance, as manifested by the acts above detailed, the garnishees are to be viewed as trustees for the intervenors,, who had a vested interest in the cotton and its proceeds, which entitles them to a preference over the attaching creditor. *Gray* v. *Trafton*, 12 M. R. 702; *Conery* v. *Webb, Rawlings & Co.*, 12 An. 282.

We deem it proper to state that Mr. Justice LEA, upon the re-hearing, had come to the same conclusion which we now express.

It is, therefore, adjudged and decreed, that the judgment of this court, heretofore rendered, be set aside, and that the judgment of the District Court be affirmed, with costs.

BURNSIDE
*v.*
McKINLEY.

---

OVERRULED DECISION OF LEA, J. The plaintiffs being creditors of *McKinley & Moore* who are absent defendants, levied an attachment upon twenty-one bales of cotton in the hands of *McElroy & Bradford.* Accompanying the shipment from the defendant to *McElroy & Bradford* was the following letter of instructions:

"SHREVEPORT, LA., March 29th, 1854.

" *Messrs. McElroy & Bradford :* '

" I send you some cotton, which I hope you will receive in due time, and I wish you to sell as soon as you can, or as the times justify, and *when sold* please pay the proceeds to *David Taylor & Co.* I will forward some more as soon as I get it to the river. Please let me hear from you as soon as you sell.

" Yours, very respectfully,
" J. N. MCKINLEY."

This letter was shown before the attachment to *David Taylor & Co.,* who have intervened in this suit, and have claimed the proceeds of this shipment as applicable to a debt due to them from the defendants. At the date of the service of the attachment the cotton had been sold, but had not been weighed or delivered.

These are substantially the facts of the case.

The question to be determined is whether *David Taylor & Co.,* the intervenors, had acquired such an interest in the cotton or its proceeds, as to protect it from attachment at the suit of a creditor of the shipper.

The cotton was in the hands of the defendants' agent; it had not been weighed or delivered. The possession of the agent was, so far as any legal consequences flowed therefrom, that of the principal, and in his hands it would have been liable to attachment.

The case is not presented, as in that of *Palmer & Co.* v. *Hornor,* of a factor who, having accepted a consignment, seeks to divert the proceeds to a different purpose from that contained in his instructions. It may be conceded that the factors in this case could have given no other destination to the proceeds of the cotton in their hands than that contained in the letter accompanying the shipment, but the rights of third parties are not affected by their obligations as factors. The exhibition of the letter of instructions to the intervenors could, under the circumstances, confer no rights upon them : it merely conveyed information of the intentions of the defendants with reference to the disposition which would be made of the proceeds of the shipment when sold. No advance was asked or obtained by the agents, nor was any new credit given upon the faith of the promised appropriation of the proceeds : the transaction consisted simply in the announcement of the *intentions* of the shipper, which no doubt would have been carried out but for the seizure. Until the sale of the cotton was complete it was subject to seizure in the hands of the defendants' agent.

It is true, as a general rule, that where the owner has lost all control over the property, and cannot change its destination, creditors cannot attach, but the application of this rule has been restricted to cases where the delegation was in some manner or form the subject matter of a contract. A mere letter of instructions from a shipper to his own agent, which is not made the basis of any new engagement or transaction, cannot be so considered, though such instructions may have been communicated by the agent to the party to whom the payment was intended to be made.

It is ordered, that the judgment appealed from be reversed, that the plaintiffs, *J. Burnside & Co.,* do have and recover of the defendants, *McKinley & Moore,* the sum of $930 17, with interest thereon at the rate of eight per cent. per annum from the 30th day of April, 1856, till paid, and costs of suit to be paid by preference out of the proceeds of the property attached herein. It is further ordered, that the intervention of *David Taylor & Co.* be dismissed at their costs, and that the defendants and intervenors pay the costs of this appeal.